1   PAUL J. BEARD II (State Bar No. 210563)
2   FISHERBROYLES LLP
    4470 W. Sunset Blvd., Suite 93165
3   Los Angeles, CA 90027
    Telephone: (818) 216-3988
4   Facsimile: (213) 402-5034
    E-mail: paul.beard@fisherbroyles.com
5
6   PETER S. BAUMAN (State Bar No. 228306)
    DAVID C. PALMER (State Bar No. 251609)
7   CALLAHAN & BLAINE
    3 Hutton Centre Drive, Ninth Floor
8   Santa Ana, CA 92707
    Telephone: (714) 241-4444
9   Facsimile: (714) 241-4445
    Email: pbauman@callahan-law.com
10  Email: dpalmer@callahan-law.com
11  Attorneys for Plaintiff
    PEACE RANCH LLC
12

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PEACE RANCH LLC, | Case No.: 2:21-cv-01651-JAM-AC |
| Plaintiff | |
| v. | **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| ROB BONTA, in his official capacity as Attorney General of the State of California; and DOES 1 through 20, inclusive, | **[42 U.S.C. § 1983]** |
| Defendant. | |

**INTRODUCTION**

1.      This case is about the crusade of one state politician, Assemblywoman Sharon Quirk-Silva, to single out and punish one mobilehome park owner located in her assembly district: Plaintiff Peace Ranch, LLC ("Peace Ranch").

2.      Peace Ranch owns the mobilehome park commonly known as Rancho La Paz ("RLP"). When it acquired RLP, Peace Ranch lawfully raised rents on mobilehome spaces to help bring them up toward market rent. Following some tenant and political push-back, Peace Ranch negotiated long-term leases with its tenants that included a schedule of agreed-to rent increases, phased in over a period of years.

3.      Frustrated at failed attempts at the local and state level to impose rent control on mobilehome parks, and setting her sights on RLP, Ms. Quirk-Silva pushed through retroactive legislation to effectively nullify those negotiated leases and impose a draconian rent cap upon RLP. The legislative history and intent of the bill confirm that the Legislature understood that the rent cap would apply solely to RLP. Indeed, targeting RLP was the legislative intent and purpose of the bill.

4.      This civil rights action challenges the legislation—Assembly Bill 978 (Quirk-Silva 2021) ("AB 978")—as patently unconstitutional.

5.      The law is an unlawful bill of attainder in violation of Article I, section 10, of the United States Constitution. It singles out one property owner, the Plaintiff, for severe and arbitrary burdens—without notice or an opportunity to be heard before being stripped of its rights. Further, the law evinces no nonpunitive legislative purpose; its sole purpose is to punish Plaintiff for lawfully increasing rents in the past.

6.      In addition, AB 978 violates the Contracts Clause of the Federal Constitution. It substantially impairs Plaintiff's existing leases with tenants, by depriving it of its contract right to rent increases. And it does so without reasonably and appropriately advancing a legitimate public purpose. To the contrary, AB 978's purpose is to benefit a relatively narrow class of private individuals at great harm to Plaintiff, which the law targets. That is not a legitimate purpose.

7.      Further, AB 978 violates Plaintiff's right to equal protection of the laws and to due process, as guaranteed to it by the Fourteenth Amendment. There is no rational basis for singling out

and discriminating against Plaintiff among many hundreds of mobilehome park owners in the State. The law also strips Plaintiff of its rights with no notice or opportunity to be heard, in violation of its due process rights.

8.      Finally, AB 978 takes Plaintiff's property right in past and future rent increases for the sole purpose of benefitting a narrow class of private individuals—namely, those who lease spaces at RLP. In so doing, AB 978 violates the federal constitutional prohibition against "private takings." A taking must be for a *public* use or purpose, not a private one.

9.      AB 978 went into effect on January 1, 2022. Plaintiff seeks a declaration that the law is unconstitutional or otherwise inapplicable, as well as a preliminary and permanent injunction prohibiting Defendant from enforcing it against Peace Ranch.

## JURISDICTION AND VENUE

10.      This action is brought pursuant to 42 U.S.C. § 1983, based on Defendant's deprivation of the constitutional rights of Plaintiff under the Fifth and Fourteenth Amendments to the United States Constitution, as well as Article I, Section 10, Clause 1 of the United States Constitution. Accordingly, this Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

11.      This Court has authority to grant the requested declaratory and injunctive relief, pursuant to 28 U.S.C. § 2201, and 42 U.S.C. § 1983, and to award attorneys' fees and costs pursuant to, *inter alia*, 42 U.S.C. § 1988.

12.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(1) and (2), because Defendant is located within this district and a substantial part of the events giving rise to Plaintiff's claims occurred in this district.

## PARTIES

13.      Plaintiff Peace Ranch is a Delaware limited liability company. It owns the RLP mobilehome park, located in the County of Orange, California.

14.      Defendant ROB BONTA is sued in his official capacity as Attorney General of the State of California. The Attorney General's responsibilities include enforcing the laws, including AB 978.

15.      Plaintiff is ignorant of the true names and capacities of Defendants sued herein as

DOES 1 through 20 and therefore sue Defendants by such fictitious names. Plaintiff is informed and believe, and on that basis allege, that each of the fictitiously named Defendants is in some manner responsible or liable for the events and happenings referred to herein, and that each such fictitiously named Defendant caused injury to Plaintiff as alleged in this Complaint. Plaintiff will amend or seek leave of court to amend this Complaint to allege the true names and capacities of such fictitiously named Defendants when the same are ascertained.

16.     Plaintiff is informed and believe, and thereon allege, that at all relevant times, each of the Defendants was the agent of each of the remaining Defendants and, in doing the things hereinafter alleged, was acting within the course and scope of such agency or employment.

## FACTUAL ALLEGATIONS

### *History of RLP and Peace Ranch's Acquisition of the Same*

17.     Peace Ranch acquired RLP in February 2019. The park straddles two cities: Anaheim and Fullerton.

18.     RLP was previously owned by a family entity that had owned it for decades. There was little or no debt on the property, and Proposition 13 limited increases in annual property taxes.  Due to low costs, the park turned a stable profit even though rent for spaces in RLP were over 40% below market rent.  When RLP was sold, any buyer would inevitably bear much higher costs, in large part because property taxes would skyrocket when the property was reassessed to market value.  When Peace Ranch bought RLP, the increase in property taxes alone represented $160 per space, per month.

19.     Shortly after acquiring RLP, Peace Ranch gave mobilehome owners notice of a rent increase, but even with the noticed increase, the rent would remain significantly below market. Controversy over the noticed rent increase ensued, so the rent increase was subsequently rescinded to allow Peace Ranch to meet with mobilehome owners, and with the city leaders of Anaheim and Fullerton, in order to develop consensus support for a schedule of agreed rent increases phased in over a period of years.

20.     A professional third party neutral was selected by a committee of park residents to facilitate negotiations between the committee and Peace Ranch. Those negotiations resulted in an agreement on the timing and amount of rent increases to go into effect over a period of years, and all

homeowners were given the opportunity to sign a long-term lease incorporating the agreed-to rent schedule.  Under the agreed rent schedule, the parks would operate at a large loss in the near term, with the break-even point not reached for five full years. Even as increased, rents at the parks would remain significantly below market for comparable parks in the area. Over sixty percent of residents have chosen to sign such a long-term lease.

21.    The parks also instituted a safety-net rent-subsidy program paid for by Peace Ranch's primary owner, out-of-pocket and administered by a third party, which is available to all homeowners entering into a long-term lease. Generally, the program is available to all residents whose monthly space rent is 40% or more of monthly income, with the subsidy amount determined by degree of need. If extreme hardship is demonstrated, the net rent increase is zero. Unfortunately, the subsidy program terminates by its own terms, and homeowners who have depended upon the subsidy program are in danger of losing this lifeline, if rent control like AB 978 is enforced against RLP.

22.    RLP, and the rent increases that have occurred there, have been the subject of considerable public controversy in both Anaheim and Fullerton. A rent control ordinance applicable to mobilehome parks was introduced in both cities, but the duly elected representatives of both cities voted not to pass the proposed ordinance. In connection with this public debate, city leaders solicited and received several firm commitments from Peace Ranch with respect to operations at its parks, and made identical written commitments to the two cities.  Attached hereto as Exhibit A are true and correct copies of the letters memorializing those commitments, which are incorporated by reference herein.

23.    Peace Ranch's willingness to make these commitments, to offer the long-term leases on the agreed terms and to provide the rent subsidy program, was to a large extent due to the decision by the two city councils not to enact rent control ordinances and to honor its agreements reached with residents and with city officials. But, as detailed below, Peace Ranch's substantial efforts proved insufficient for AB 978's author and chief sponsor.

### *State of Mobilehome Rent Control Prior to AB 978*

24.    The Mobilehome Residency Law is a state statute that regulates the terms and conditions of tenancies in mobilehome parks. A "tenancy" in this context consists of the use of a space

within a mobilehome park on which the tenant locates, maintains, or occupies a mobilehome, and uses the services and facilities of the park.

25.     The Mobilehome Residency Law does not impose rent control on mobilehome park owners. Before AB 978, the subject this action, no state statute imposed rent control on any mobilehome park in California.

26.     In 2019, the Legislature enacted, and the Governor signed into law, the Tenant Protection Act of 2019 ("AB 1482"). With limited exceptions, AB 1482 prohibits an owner of residential real property from increasing the gross rental rate for a dwelling or unit more than 5% plus the percentage change in the cost of living, or 10%, which is lower. But AB 1482 expressly exempts mobilehome parks.

27.     Since then, there have been state-legislative efforts, including by AB 978's author and chief sponsor, Assembly member Sharon Quirk-Silva of Fullerton, to enact statewide rent control of mobilehome parks. But, until AB 978, those state-legislative efforts have failed.

28.     For example, in 2020, Ms. Quirk-Silva introduced AB 2895. That bill would have extended AB 1482's rent-control provisions to mobilehome parks. It would have prohibited any park from increasing the gross rental rate for a tenancy more than 5% plus the percentage change in the cost of living, as defined, or 10%, which is lower, of the lowest gross rental rate charged for the immediately preceding 12 months. It would have also prohibited a park from increasing the gross rental rate for a tenancy in more than 2 increments over a 12-month period, after the tenant maintains a tenancy over a 12-month period.

29.     Ms. Quirk-Silva's bill, AB 2895, died in committee. At present, and with a single exception reflected in the bill's legislative history, mobilehome parks are not subject to rent control.

### *The Legislature Targeted Peace Ranch for Draconian Rent Control When It Drafted and Enacted AB 978*

30.     Quirk-Silva is an assembly person from Fullerton. Not only is RLP partly in her district, but her husband, Jesus Silva, is the mayor of Fullerton.

31.     Despite Mr. Silva's local lobbying efforts, the Fullerton city council has refused to impose rent control on mobilehome parks operating in its jurisdiction. The city council of Anaheim,

too, has chosen not to impose rent control on its mobilehome parks.

32.     Because of Fullerton's and Anaheim's refusal to enact mobilehome park rent control, and because Peace Ranch dared to exercise its contractual right to bring rents up to market, Quirk-Silva set her sights on RLP for punitive action. She authored and sponsored AB 978, which was first introduced in February 2021. On July 23, 2021, Defendant Gavin Newsom signed AB 978 into law. Attached hereto as Exhibit B is a true and correct copy of the bill, which is incorporated by reference herein. The law becomes effective on January 1, 2022, and will be operative until January 1, 2030.

33.     Among other things, AB 978 prohibits any "qualified mobilehome park" from raising the gross rental rate for a park space more than 3 percent plus the percentage change in the cost of living, or 5 percent, whichever is lower.

34.     AB 978 defines a "qualified mobilehome park" as "a mobilehome park, as defined in Section 798.4 [of the Civil Code], that is located within and governed by the jurisdictions of two or more incorporated cities."  Section 798.4 of the Civil Code defines a "mobilehome park" as "an area of land  where two or more mobilehome sites are rented, or held out for rent, to accommodate mobilehomes used for human habitation." The bill's sponsors asserted RLP was a single mobilehome park straddling two incorporated cities.

35.     The bill's sponsors were intent on singling out **only** Plaintiff Peace Ranch. The bill's legislative history reflects concerns that there might be owners of mobilehome parks straddling two or more incorporated cities who might be made subject to the law's punitive measures. The bill's sponsors did not want the bill to apply to any owner other than Plaintiff. Thus, they wrote AB 978 in hopes of ensuring that only Peace Ranch would be subjected to the law.

36.     AB 978 states that the legislative intent is to protect only mobilehome park tenants who "reside in counties with populations between 2,500,000 and 3,250,000 according to the last census count." The only county with a population within that deliberately-narrow range is Orange County, which is home to RLP. According to the 2020 census, Orange County has a population of approximately 3,186,989. The counties with the next highest and lowest populations are San Diego and Riverside, at 3,298,634 and 2,418,185, respectively—which put mobilehome residents in those counties out of AB 978's reach.

37.     Even if a mobilehome park straddling two incorporated cities within either county were established in the next ten years, the park would be exempt from AB 978's rent cap. The next census will not be taken until 2030 and reported until 2031, after AB 978 has expired. Thus, unless a mobilehome park straddling two cities *within Orange County* is suddenly established in the next 7 years—an exceedingly unlikely prospect—AB 978 threatens only RLP.

38.     AB 978's hard cap on rents of 5% is *half* the hard cap on rents that AB 1482 imposed on other classes of residential rental property and is *half* the hard cap on rents that Ms. Quirk-Silva's failed AB 2895 would have imposed on mobilehome parks across the State.  However, nothing in the legislative history or text of AB 978 offers any rationale why a significantly lower and more burdensome rent cap should apply to Peace Ranch.

39.     AB 978 applies retroactively to rent increases for mobilehome spaces occurring on or after February 18, 2021. Further, AB 978 does not grandfather in or otherwise exempt any leases existing at the time of its enactment or effective date. Thus, the law unilaterally, and without notice or opportunity to be heard, eliminates all phased rent increases contemplated by existing leases.

40.     While Peace Ranch believes RLP is actually two separate parks (one in Anaheim and the other in Fullerton), both the Legislature *and* Defendant Attorney General (collectively, "the State") believe that Rancho La Paz is a single park straddling two cities and is therefore subject to AB 978. Given the State's clear position, and to avoid injury in the form of an action seeking to enforce AB 978 and associated penalties based on the belief that RLP is a single park, Peace Ranch has been forced to conform its conduct to the mandates of AB 978. Specifically, in response to the threat of enforcement and penalties, Peace Ranch has maintained its rents below the rent cap imposed by AB 978. Absent this threat, Peace Ranch would not have been compelled to keep RLP's rents below AB 978's cap.

## FIRST CLAIM

### Violation of Federal Constitutional Prohibition on Bills of Attainder

### (U.S. Const. art. I, § 10)

41.     Plaintiff incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

42.     Article I, section 10, of the United States Constitution states that "[n]o State . . . pass any Bill of Attainder." A bill of attainder has the following three components: it "(1) specifies the affected persons, and (2) inflicts punishment (3) without a judicial trial." *SeaRiver Maritime Fin. Holdings, Inc. v. Mineta*, 309 F.3d 662, 668 (9th Cir. 2002). Even if the targeted individual or group is not expressly named in the challenged law, if its identity is "easily ascertainable," the law "singles" out the individual or group for purposes of the Bill of Attainder analysis. *Olson v. Bonta*, 2021 U.S. Dist. LEXIS 133111, *27 (C.D. Cal. 2021).

43.     "Three inquiries determine whether a statute inflicts punishment on the specified individual or group: (1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes; and (3) whether the legislative record evinces a congressional intent to punish." *SeaRiver*, 309 F.3d at 673 (internal quotation marks omitted) (quoting *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 473, 475-76, 478 (1977). As to the second inquiry, "where such legitimate legislative purposes do not appear, it is reasonable to conclude that punishment of individuals disadvantaged by the enactment was the purpose of the decisionmakers." *Nixon*, 433 U.S. at 476.

44.     AB 978 was designed to, and its legislative history does, single out one property owner: Peace Ranch.

45.     Further, the law inflicts "punishment" on Peace Ranch without notice, a hearing, or opportunity to be heard, let alone a judicial trial. AB 978 evinces no nonpunitive legislative purpose. Its sole purpose is punitive, including, without limitation, because:

   a.   A senate  floor analysis reveals that AB 978's author, Quirk-Silva wrote the bill specifically to penalize Peace Ranch for having exercised its right to raise rents when they were substantially below market. Those rent increases were lawful and economically necessary. But, following alleged complaints by some tenants, and repeated failure at the state and local levels to impose rent control, Quirk-Silva decided to draft AB 978 so as to retroactively undo those lawful rent increases and substantially diminish Peace Ranch's right to raise rents in the future.

b.  One pretext for AB 978 is "general concern over rising mobilehome rents" in places like Oakland, San Francisco, San Jose, and Los Angeles County. Yet, when the Legislature passed AB 978, the legislative history reveals that the Legislature was informed and aware that AB 978 targeted only RLP, as intended.

c.  Further, no other class of residential rental property is subject to a state-law cap on rent as draconian as the rent cap that AB 978 imposes on Peace Ranch. AB 1482, which applies to most residential rental properties except for mobilehome parks, allows annual rent increases of five percent plus inflation up to a maximum cap of 10 percent. Even the failed AB 2895 would have simply extended AB 1482's rent cap to mobilehome parks in the State. In stark contrast, AB 978 purports to allow Peace Ranch to raise rents by only *three* percent plus inflation up to a maximum cap of only *five* percent. The legislation provides no rationale for the stark and disparate treatment of Peace Ranch.

d.  Another pretext for AB 978 is that it will ensure that residents at Peace Ranch are not be subject to two different sets of tenant protections that may cause community division (i.e., one set for Fullerton residents, and another set for Anaheim residents). However, as the legislative history readily admits, both Fullerton and Anaheim have decided *against* imposing rent control on mobilehome park owners. Thus, park residents in Fullerton enjoy no greater or lesser protection than park residents in Anaheim. AB 978 is a "solution" in desperate search of a problem that does not exist.

46.  Because AB 978's legislative history and intent target one property owner in the State, it is punitive, and strips said owner of contractual and property rights without notice, a hearing, or opportunity to be heard, let alone a trial, AB 978 is an unconstitutional bill of attainder.

47.  Plaintiff has no adequate remedy at law, and will suffer serious and irreparable harm to its constitutional rights unless Defendant is immediately enjoined from implementing and enforcing AB 978.

/ / /

**SECOND CLAIM**

**Violation of the Federal Contracts Clause**

**(U.S. Const. Art. 1, § 10, cl.1)**

48.     Plaintiff incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

49.     The Contracts Clause of the United States Constitution prohibits states from passing "any . . . Law impairing the Obligation of Contracts." U.S. Const., Art. I, §10, cl. 1.

50.     Whether a law substantially impairs a contractual relationship depends upon "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen v. Melin*, 138 S. Ct. 1815, 1822 (2018).

51.     First, the court will determine whether the law "operate[s] as a substantial impairment of a contractual relationship." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978). "In answering that question, the Court has considered the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen*, 138 S. Ct. at 1822.

52.     Second, the court considers "whether the [challenged] law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Sveen*, 138 S. Ct. at 1822 (quoting *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411-412 (1983)). Once a substantial impairment is shown, the burden shifts to the law's defender to establish the law is sufficiently tailored to advance a significant and legitimate public purpose.

53.     Here, AB 978 substantially impairs the contractual relationship between Peace Ranch and tenants who rent spaces at RLP. Peace Ranch has leases with tenants, which entitle Peace Ranch to periodic, phased-in rent increases. AB 978 retroactively undoes those contractually allowed rent increases dating back to February 2021, and substantially limits current and future rent increases at RLP through 2030. AB 978's rewriting of those leases substantially interferes with Peace Ranch's reasonable expectations upon acquiring RLP in 2019 and entering into said existing leases with tenants. Further, AB 978 provides Peace Ranch with no mechanism, judicial or otherwise, to restore

rightful rent increases pursuant to those leases. The law's impairment of Peace Ranch's leases is substantial.

54.   Further, the State cannot establish that AB 978 is drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose. The only "public purpose" AB 978 *purports* to serve is to address statewide rent increases at mobilehome parks. Assuming *arguendo* that this is something other than a pretext for singling out Peace Ranch, the law is not drawn appropriately or reasonably to advance that purpose. Instead of addressing statewide rent increases by mobilehome parks, the Legislature knowingly and intentionally targeted *one* park owner—Peace Ranch—in clear retribution for increasing rents on park spaces in years past. That is neither appropriate nor reasonable.

55.   In reality, the law has no public purpose. Its sole purpose is to punish one mobilehome park owner, to the private benefit of a narrow class of private tenants at that park.

56.   AB 978 substantially impairs Peace Ranch's contractual relationships at its park, with no apparent public purpose, and for that reason must be declared unconstitutional and enjoined as such.

57.   Plaintiff has no adequate remedy at law, and will suffer serious and irreparable harm to its constitutional rights unless Defendant is immediately enjoined from implementing and enforcing AB 978.

## THIRD CLAIM

### Violation of the Federal Equal Protection Clause

### (U.S. Const. amend. XIV, § 1)

58.   Plaintiff incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

59.   The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides, in relevant part that "[n]o State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. For a challenged law that discriminates on the basis of an economic or property-related classification, the law will be held invalid under the Equal Protection Clause unless there is a "reasonably conceivable

state of facts that could provide a rational basis" for said discrimination. *Merrifield v. Lockyer*, 547 F.3d 978, 989 (9th Cir. 2008) (quoting *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993).

60.   AB 978 was designed to, and does, discriminate against Peace Ranch. The law's stated purpose is to punish Peace Ranch for exercising its lawful right to raise rents, by retroactively impairing past rent increases and capping future ones. There is no reasonably conceivable state of facts that could provide a rational basis for AB 978's discriminatory treatment of Peace Ranch.

61.   Plaintiff has no adequate remedy at law, and will suffer serious and irreparable harm to its constitutional rights unless Defendant is immediately enjoined from implementing and enforcing AB 978.

### FOURTH CLAIM

**Violation of the Federal Due Process Clause**

**(U.S. Const. amend. XIV, § 1)**

62.   Plaintiff incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

63.   The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides, in relevant part that "[n]o State shall make or enforce any law which shall . . . deprive any person of life, liberty, or property, without due process of law."

64.   "One of due process's central and undisputed guarantees is that, before the government permanently deprives a person of a property interest, that person will receive—at a minimum— notice." *Wright v. Beck*, 981 F.3d 719, 727 (9th Cir. 2020) (citing *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). "Notice is so critical because it enables the opportunity to be heard." *Wright*, 981 F.3d at 727. "A meaningful opportunity to be heard, in turn, provides its own benefits. It helps minimize substantively unfair or mistaken deprivations. It also preserves the high value, embedded in our constitutional and political history, that we place on a person's right to enjoy what is his, free of governmental interference. And it preserves a person's dignity to choose for himself whether to appear or default, acquiesce or contest. Without notice, [the] right to be heard has little reality or worth." *Id.* (internal citations and quotation marks omitted).

65.   AB 978 has destroyed Peace Ranch's property right in lawful rent increases on

mobilehome park spaces, as provided for in leases with tenants. It has done so without notice or an opportunity to be heard. Thus, AB 978 violates Peace Ranch's due process rights.

66.     Plaintiff has no adequate remedy at law, and will suffer serious and irreparable harm to its constitutional rights unless Defendant is immediately enjoined from implementing and enforcing AB 978.

## FIFTH CLAIM

### Violation of the Federal Takings Clause's Prohibition on Private Takings

### (U.S. Const. amends. V, XIV)

67.     Plaintiff incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

68.     The Takings Clause of the Fifth Amendment to the United States Constitution prohibits the government from taking private property unless (a) it is for a "public use" and (b) "just compensation" is paid to the property owner. U.S. Const. amend. V, XIV (making Takings Clause applicable to the states); see *also Brown v. Legal Foundation of Washington*, 538 U.S. 216, 231-32 (2003) (underscoring the Takings Clause's two separate requirements). The Takings Clause was enshrined in the Constitution so that the government would not "force some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

69.     If the government "fails to meet the 'public use' requirement," then "that is the end of the inquiry," and "[n]o amount of compensation can authorize such action." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005). A government taking of property for a private use or purpose is barred. As the United States Supreme Court has explained: "it has long been accepted that the sovereign" (i.e., the government) "may not take the property of A for the sole purpose of transferring it to B." *Kelo v. City of New London*, 545 U.S. 469, 477 (2005); Calder v. Bull, 3 U.S. 386 (1798). (holding that "[i]t is against all reason and justice" to presume that the legislature has been entrusted with the power to enact "a law that takes property from A and gives it to B")).

70.     "Nor would the [government] be allowed to take property under the mere pretext of a public purpose, when its actual purpose was to bestow a private benefit." *Kelo*, 545 U.S. at 478. If a

taking is designed simply "to benefit a particular class of identifiable individuals," then the taking is not for a "public use" consistent with the Public Use Clause, and is therefore unconstitutional. *Id.* Significantly, takings with only an "incidental" public benefit "are forbidden by the Public Use Clause." *Id.* at 490 (Kennedy, J., concurring); *see also Loretto v. Teleprompter Manhattan Catv Corp.*, 458 U.S. 419 (1982) (holding that a "taking" under the Takings Clause occurs even when, under the authority of law, "a stranger directly invades and occupies the owner's property" and does not pass to or through the government's hands).

71.     AB 978 works an unconstitutional taking for a private use. The law takes Peace Ranch's property right in lawful rent increases on spaces at Ranch La Paz, as guaranteed by its leases, and transfers the value of that right to tenants. The taking is not a "public use" or "purpose," but simply "benefits a particular class of identifiable individuals"—i.e., certain RLP tenants. *Kelo*, 545 U.S. at 490 (Kennedy, J., concurring). As such, the taking is quintessentially private and therefore *per se* unconstitutional.

72.     Plaintiff has no adequate remedy at law, and will suffer serious and irreparable harm to its constitutional rights unless Defendant is immediately enjoined from implementing and enforcing AB 978.

## SIXTH CLAIM

### Violation of the Federal Takings Clause's Prohibition on Private Takings

### (U.S. Const. amends. V, XIV)

73.     Plaintiff incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

74.     The Takings Clause of the California Constitution states that "property may be taken or damaged for a public use and only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner." Cal. Const. art. I, § 19(a).

75.     The Legislature cannot take private property for a private use or purpose. *Cash v. Southern Pacific R.R. Co.*, 123 Cal. App. 3d 974, 977 n.2 (1981); *People ex rel. Department of Public Works v. Lagiss*, 223 Cal. App. 2d 23 (1963). *Sherman v. Buick*, 32 Cal. 241 (1867). A legislative determination that a certain business is a public use is not conclusive. *Consolidated Channel Co. v.*

*Central P. R. Co.* 51 Cal. 269 (1876); *People ex rel. Department of Public Works v. Nahabedian*, 171 Cal. App. 2d 302 (1959) (that taking is not for a public purpose is a defense to eminent domain).

76.    AB 978 works an unconstitutional taking for a private use, in violation of the California Constitution. The law takes Peace Ranch's property right in lawful rent increases on spaces at RLP, as guaranteed by its leases, and transfers the value of that right to tenants. The taking is not a "public use" or "purpose," but simply "benefits a particular class of identifiable individuals"—i.e., certain RLP tenants. As such, the taking is quintessentially private and therefore *per se* unconstitutional.

77.    Plaintiff has no adequate remedy at law, and will suffer serious and irreparable harm to its constitutional rights unless Defendant is immediately enjoined from implementing and enforcing AB 978.

<b>PRAYER FOR RELIEF</b>

WHEREFORE, Plaintiffs requests relief as follows:

1.    As to all claims:

    a.    A declaratory judgment that AB 978 is unconstitutional, null and void, and of no effect.

    b.    A temporary, preliminary, and permanent injunction enjoining Defendant, and all those in active concert or participation with him, from implementing or enforcing AB 978.

2.    Nominal damages to Plaintiff for violation of its federal constitutional rights.

3.    Reasonable attorneys' fees and costs incurred in this action pursuant to, *inter alia*, 42 U.S.C. § 1988.

4.    Any and all other relief to Plaintiffs as the Court may deem proper and just.

DATED: March 4, 2022                              s/ Paul Beard II

_____

                                        PAUL BEARD II

# Exhibit A



4040 MacArthur Blvd., Suite 300
Newport Beach, CA 92660
**Tel:** (949) 251-0444
**Fax:** (949) 251-0888

**John R. Saunders**
President

August 9, 2019

Mr. Chris Zapata
City Manager
City of Anaheim
200 S. Anaheim Blvd.
Anaheim, CA 92805

   Re: Rancho La Paz Mobile Home Park

Dear Mr. Zapata:

   As you know, the increase in space rents at Rancho La Paz, made necessary by the dramatically higher park expenses, will be difficult for a number of the homeowners in the park. I have worked with the park residents and various city officials in both Anaheim and Fullerton to mitigate the impact of the rent increases on the residents.  Without recounting the details here, our efforts resulted in a mediated agreement between ownership and the committee of residents regarding the rent increases.  The terms of this agreement were stated in our letter to you dated July 9, 2019.  This letter also discussed a safety net rent subsidy program in place at the park to prevent any resident from being forced from the park due to the inability to pay the increased rent.

   To address some of the concerns about whether these arrangements adequately safeguard the interests of the residents, I am providing certain assurances regarding the duration of the subsidy program and other areas of particular concern.   The purpose of this letter is to memorialize those commitments.

   (1) Sales of existing homes will be approved or denied in writing within 10 business days after receipt of all required application documents from the resident and the proposed purchaser.  If denied, the basis for denial will be specified in writing to both the resident and the proposed purchaser.

   (2) The rent subsidy safety net program will remain in place for each park resident who enters into either of the offered 6-year and 10-year term leases for the first six years of the lease term.  I will personally fund the program by paying into the park account the amounts

Mr. Chris Zapata
August 9, 2019
Page 2

representing the subsidy for the enrolled recipients.  Any separate rental assistance provided by or through the City will of course be welcomed, and any amounts provided to residents will not reduce the amount of the subsidy received by residents enrolled in the park safety net program.

(3)     The park will remain a "seniors" park for at least 5 years.  During such period, the homeowner must be age 55 or over. Any additional residents must be age 35 or over, except for caregivers, who cannot be age-restricted due to regulatory constraints.

Please note that, in the event any rent control or similar ordinance, initiative or other measure affecting the park is enacted, these assurances will be deemed superseded and become non-binding.

I appreciate the opportunity to address concerns for the well-being of homeowners residing in Rancho La Paz and remain committed to maintaining the park as a desirable and affordable home for our residents.  I will continue to be available to respond to your questions or concerns.

Very truly yours,

John Saunders

cc:     Star Management Company



SAUNDERS PROPERTY
C O M P A N Y

4040 MacArthur Blvd., Suite 300
Newport Beach, CA 92660
**Tel:** (949) 251-0444
**Fax:** (949) 251-0888

**John R. Saunders**
President

August 8, 2019

Mr. Ken Domer
City Manager
City of Fullerton
303 W. Commonwealth Avenue
Fullerton, CA 92832

      Re:    Rancho La Paz Mobile Home Park

Dear Mr. Domer:

As you know, the increase in space rents at Rancho La Paz, made necessary by the dramatically higher park expenses, will be difficult for a number of the homeowners in the park. I have worked with the park residents and various city officials in both Anaheim and Fullerton to mitigate the impact of the rent increases on the residents. Without recounting the details here, our efforts resulted in a mediated agreement between ownership and the committee of residents regarding the rent increases. The terms of this agreement were stated in our letter to you dated July 9, 2019. This letter also discussed a safety net rent subsidy program in place at the park to prevent any resident from being forced from the park due to the inability to pay the increased rent.

Since that time, city officials have considered whether these arrangements adequately safeguard the interests of the residents and have requested certain assurances regarding the duration of the subsidy program and other areas of particular concern. The purpose of this letter is to memorialize those commitments.

(1)    Sales of existing homes will be approved or denied in writing within 10 business days after receipt of all required application documents from the resident and the proposed purchaser. If denied, the basis for denial will be specified in writing to both the resident and the proposed purchaser.

(2)    The rent subsidy safety net program will remain in place for each park resident who enters into either of the offered 6-year and 10-year term leases for the first six years of the lease term. I will personally fund the program by paying into the park account the amounts

Mr. Ken Domer
August 8, 2019
Page 2

representing the subsidy for the enrolled recipients.  Any separate rental assistance provided by or through the City will of course be welcomed, and any amounts provided to residents will not reduce the amount of the subsidy received by residents enrolled in the park safety net program.

(3)     The park will remain a "seniors" park for at least 5 years.  During such period, the homeowner must be age 55 or over. Any additional residents must be age 35 or over, except for caregivers, who cannot be age-restricted due to regulatory constraints.

Please note that, in the event any rent control or similar ordinance, initiative or other measure affecting the park is enacted, these assurances will be deemed superseded and become non-binding.

I appreciate the opportunity to address the concerns expressed by city officials and other interested parties for the well-being of homeowners residing in Rancho La Paz and am pleased that we have reached a satisfactory resolution.  I remain committed to maintaining the park as a desirable and affordable home for our residents and will continue to be available to respond to your questions or concerns.

Very truly yours,

John Saunders

cc:     Star Management Company

# Exhibit B

# Assembly Bill No. 978

## CHAPTER 125

An act to amend Sections 1946.2 and 1947.12 of, and to add and repeal Section 798.30.5 of, the Civil Code, relating to mobilehomes.

[Approved by Governor July 23, 2021. Filed with Secretary of
State July 23, 2021.]

### LEGISLATIVE COUNSEL'S DIGEST

AB 978, Quirk-Silva. Mobilehome parks: rent caps.

Existing law, the Mobilehome Residency Law, prescribes various terms and conditions of tenancies in mobilehome parks. Existing law defines "tenancy" for these purposes as the right of a homeowner to use a site within a mobilehome park on which to locate, maintain, and occupy a mobilehome for human habitation, including the use of the services and facilities of the park. Existing law, the Tenant Protection Act of 2019, prohibits, with certain exceptions, an owner of residential real property from increasing the gross rental rate for a dwelling or unit more than 5% plus the percentage change in the cost of living, as defined, or 10%, whichever is lower, of the lowest gross rental rate charged for the immediately preceding 12 months, subject to specified conditions. Existing law excludes an owner or operator of a mobilehome park and an owner of a mobilehome or their agent from these provisions.

This bill would extend the rental rate increase restrictions described above to any person having the right to offer residential real property for rent, including an owner or operator of any dwelling or unit in a mobilehome park. The bill would apply to rent increases for a tenancy in a mobilehome occurring on or after February 18, 2021, as specified. The bill would exclude certain mobilehomes from these provisions, including mobilehomes that are not owned by the management of a mobilehome park if notice is provided to the tenant, as specified.

This bill would, until January 1, 2030, prohibit the management of a qualified mobilehome park, as defined, from increasing the gross rental rate for a tenancy for a mobilehome space more than 3% plus the percentage change in the cost of living, as defined, or 5%, whichever is lower, of the lowest gross rental rate charged at any time during the immediately preceding 12 months, as specified. The bill would define "qualified mobilehome park" as a mobilehome park that is located within and governed by the jurisdictions of 2 or more incorporated cities. The bill would prohibit management of a qualified mobilehome park from increasing the gross rental rate for a tenancy in more than 2 increments over a 12-month period, after the tenant maintains a tenancy over a 12-month period. The bill would exempt specified mobilehome spaces from these provisions, including, among others,

mobilehome spaces restricted by deed, regulatory restriction contained in an agreement with a government agency, or other recorded document as affordable for very low, low-, or moderate-income persons and families and mobilehome spaces within a resident-owned mobilehome park. The bill would specify that these provisions apply to rent increases for mobilehome spaces occurring on or after February 18, 2021. The bill would provide that in the event that management increased the rent by more than the amount specified above between February 18, 2021, and January 1, 2022, then the applicable rent on January 1, 2022, is the rent as of February 18, 2021, plus the maximum permissible increase, and that management is not be liable to the homeowner for any corresponding rent overpayment. The bill would authorize management who increased the rent by less than the amount specified above between February 18, 2021, and January 1, 2022, to increase the rent twice within 12 months of February 18, 2021, but not by more than the amount specified above. The bill would void any waiver of the rights provided under these provisions.

Existing law, the Tenant Protection Act of 2019, prohibits, until January 1, 2030, an owner of residential real property from terminating the tenancy of certain tenants without just cause, either at-fault or no-fault of the tenant. The act exempts certain types of residential real properties or residential circumstances from these provisions, including, among others, housing that has been issued a certificate of occupancy within the previous 15 years and certain housing that is not owned by specified entities, including a corporation or limited liability corporation in which at least one member is a corporation, if specified notice is provided to the tenant. The act defines the term "owner" to exclude an owner or operator of a mobilehome park and an owner of a mobilehome or their agent from these provisions.

This bill would, for purposes of the just cause provisions described above, redefine the term "owner" to include an owner or operator of a mobilehome park and an owner of a mobilehome or their agent. The bill would exclude mobilehomes from the provision that exempts housing issued a certificate of occupancy within the previous 15 years from the just cause requirements. The bill would exclude certain mobilehomes from these provisions, including mobilehomes that are not owned by the management of a mobilehome park or any of the other entities specified above, if notice is provided to the tenant as specified. The bill would require an owner of a mobilehome subject to these provisions to provide written notice of these provisions to a tenant, as specified.

*The people of the State of California do enact as follows:*

SECTION 1.   The Legislature finds and declares all of the following:
(a)  California has a severe housing crisis.
(b)  The COVID-19 pandemic has impacted California homeowners, tenants, and landlords significantly.

(c) To help keep those affected by COVID-19 housed, California and the federal government have assisted with eviction protections and rental repayment assistance through the passage of the COVID-19 Tenant Relief Act.

(d) California recently broke the $800,000 median home price mark for the first time in history, showing the need for California families to have the support of the State of California to assist them in achieving the American dream of one day owning a home.

(e) Mobilehomes are an excellent option for affordable home ownership for many Californians.

(f) Many of California's mobilehome owners are seniors, veterans, and families seeking an affordable community environment in which to live.

(g) Just like apartment renters that have faced rent increases, some mobilehome residents in nonrent control jurisdictions may have experienced rent increases.

(h) Mobilehome residents are different from traditional apartment residents in that they own their home and have equity, but rent the land on which their home resides. Rents paid by mobilehome residents cover park amenities, park common areas, and maintenance of in-park infrastructure like roads and fences, and, in addition to rents, residents are still responsible for making other payments just like other homeowners, including paying mortgages and taxes, as well as making payments for repairs and maintenance.

(i) In enacting this legislation, it is the intent of the Legislature to protect mobilehome owners in qualified mobilehome parks that have been subject to rent increases that reside in counties with populations between 2,500,000 and 3,250,000 according to the last census count.

SEC. 2.   Section 798.30.5 is added to the Civil Code, to read:

798.30.5.   (a)  (1)  Subject to subdivision (b), management shall not, over the course of any 12-month period, increase the gross rental rate for a tenancy in a qualified mobilehome park more than 3 percent plus the percentage change in the cost of living, or 5 percent, whichever is lower, of the lowest gross rental rate charged for a tenancy at any time during the 12 months prior to the effective date of the increase.

(2)  If the same homeowner maintains a tenancy over any 12-month period, the gross rental rate for the tenancy shall not be increased in more than two increments over that 12-month period, subject to the other restrictions of this subdivision governing gross rental rate increase.

(b)  For a new tenancy in which no homeowner from the prior tenancy remains in lawful possession of the mobilehome space, management may establish the initial rental rate not subject to subdivision (a), unless the applicable local agency or jurisdiction has adopted an ordinance, rule, regulation, or initiative measure that limits the allowable rental rate for a new tenancy, in which case that ordinance, rule, regulation, or initiative measure shall apply. Subdivision (a) shall be applicable to subsequent increases after that initial rental rate has been established, except as otherwise provided in this section.

(c)  A homeowner with a tenancy subject to this section shall not enter into a sublease that results in a total rent for the premises that exceeds the allowable rental rate authorized by subdivision (c) of Section 798.23.5. Nothing in this subdivision authorizes a homeowner to sublet or assign the homeowner's interest where otherwise prohibited.

(d)  Management shall provide notice of any increase in the rental rate, pursuant to subdivision (a), to each homeowner in accordance with Section 798.30.

(e)  This section shall not apply to a tenancy for any of the following:

(1)  A mobilehome space restricted by deed, regulatory restriction contained in an agreement with a government agency, or other recorded document as affordable housing for persons and families of very low, low, or moderate income, as defined in Section 50093 of the Health and Safety Code, or subject to an agreement that provides housing subsidies for affordable housing for persons and families of very low, low, or moderate income, as defined in Section 50093 of the Health and Safety Code or comparable federal statutes.

(2)  A mobilehome space constructed and maintained in connection with any higher education institution within the state for use and occupancy by students in attendance at the institution.

(3)  A mobilehome space subject to any ordinance, rule, regulation, or initiative measure that restricts annual increases in the rental rate to an amount less than that provided in subdivision (a).

(4)  A mobilehome space within a resident-owned mobilehome park, as defined in Section 799.

(f)  (1)  (A)  This section shall apply to all rent increases occurring on or after February 18, 2021.

(B)  This section shall become operative January 1, 2022.

(2)  In the event that management has increased the rent by more than the amount permissible under subdivision (a) between February 18, 2021, and January 1, 2022, both of the following shall apply:

(A)  The applicable rent on January 1, 2022, shall be the rent as of February 18, 2021, plus the maximum permissible increase under subdivision (a).

(B)  Management shall not be liable to a homeowner for any corresponding rent overpayment.

(3)  Management subject to subdivision (a) who increased the rental rate for a tenancy on or after February 18, 2021, but prior to January 1, 2022, by an amount less than the rental rate increase permitted by subdivision (a) shall be allowed to increase the rental rate twice, as provided in paragraph (2) of subdivision (a), within 12 months of February 18, 2021, but in no event shall that rental rate increase exceed the maximum rental rate increase permitted by subdivision (a).

(g)  Any waiver of the rights under this section shall be void as contrary to public policy.

(h)  For the purposes of this section:

(1) "Consumer Price Index for All Urban Consumers for All Items" means the following:

(A) The Consumer Price Index for All Urban Consumers for All Items (CPI-U) for the metropolitan area in which the property is located, as published by the United States Bureau of Labor Statistics, which are as follows:

(i) The CPI-U for the Los Angeles-Long Beach-Anaheim metropolitan area covering the Counties of Los Angeles and Orange.

(ii) The CPI-U for the Riverside-San Bernardo-Ontario metropolitan area covering the Counties of Riverside and San Bernardino.

(iii) The CPI-U for the San Diego-Carlsbad metropolitan area covering the County of San Diego.

(iv) The CPI-U for the San Francisco-Oakland-Hayward metropolitan area covering the Counties of Alameda, Contra Costa, Marin, San Francisco, and San Mateo.

(v) Any successor metropolitan area index to any of the indexes listed in clauses (i) to (iv), inclusive.

(B) If the United States Bureau of Labor Statistics does not publish a CPI-U for the metropolitan area in which the property is located, the California Consumer Price Index for All Urban Consumers for All Items as published by the Department of Industrial Relations.

(C) On or after January 1, 2022, if the United States Bureau of Labor Statistics publishes a CPI-U index for one or more metropolitan areas not listed in subparagraph (A), that CPI-U index shall apply in those areas with respect to rent increases that take effect on or after August 1 of the calendar year in which the 12-month change in that CPI-U, as described in subparagraph (B) of paragraph (3), is first published.

(2) "Management" means the management, as defined in Section 798.2, of a qualified mobilehome park.

(3) (A) "Percentage change in the cost of living" means the percentage change in the applicable Consumer Price Index for All Urban Consumers for All Items, as described in paragraph (1) and computed pursuant to subparagraph (B) of this paragraph.

(B) (i) For rent increases that take effect before August 1 of any calendar year, the following shall apply:

(I) The percentage change shall be the percentage change in the amount published for April of the immediately preceding calendar year and April of the year before that.

(II) If there is not an amount published in April for the applicable geographic area, the percentage change shall be the percentage change in the amount published for March of the immediately preceding calendar year and March of the year before that.

(ii) For rent increases that take effect on or after August 1 of any calendar year, the following shall apply:

(I) The percentage change shall be the percentage change in the amount published for April of that calendar year and April of the immediately preceding calendar year.

93

(II) If there is not an amount published in April for the applicable geographic area, the percentage change shall be the percentage change in the amount published for March of that calendar year and March of the immediately preceding calendar year.

(iii) The percentage change shall be rounded to the nearest one-tenth of 1 percent.

(4) "Qualified mobilehome park" means a mobilehome park, as defined in Section 798.4, that is located within and governed by the jurisdictions of two or more incorporated cities.

(i) (1) Nothing in this section affects the authority of a local government to adopt or maintain an ordinance, rule, regulation, or initiative measure that establishes a maximum amount that may be charged for rent. However, if a local ordinance, rule, regulation, or initiative measure allows for a rental rate increase greater than that provided in subdivision (a), this section shall apply.

(2) Nothing in this section alters the application of Sections 798.17, 798.45, or 798.49 to any ordinance, rule, regulation, or initiative measure that establishes a maximum amount that may be charged for rent.

(3) This section is not intended to express any policy regarding the appropriate, allowable rental rate increase limitations when a local government or jurisdiction adopts an ordinance, rule, regulation, or initiative measure regulating rent increases.

(j) This section shall remain in effect only until January 1, 2030, and as of that date is repealed.

SEC. 3. Section 1946.2 of the Civil Code is amended to read:

1946.2. (a) Notwithstanding any other law, after a tenant has continuously and lawfully occupied a residential real property for 12 months, the owner of the residential real property shall not terminate the tenancy without just cause, which shall be stated in the written notice to terminate tenancy. If any additional adult tenants are added to the lease before an existing tenant has continuously and lawfully occupied the residential real property for 24 months, then this subdivision shall only apply if either of the following are satisfied:

(1) All of the tenants have continuously and lawfully occupied the residential real property for 12 months or more.

(2) One or more tenants have continuously and lawfully occupied the residential real property for 24 months or more.

(b) For purposes of this section, "just cause" includes either of the following:

(1) At-fault just cause, which is any of the following:

(A) Default in the payment of rent.

(B) A breach of a material term of the lease, as described in paragraph (3) of Section 1161 of the Code of Civil Procedure, including, but not limited to, violation of a provision of the lease after being issued a written notice to correct the violation.

(C)  Maintaining, committing, or permitting the maintenance or commission of a nuisance as described in paragraph (4) of Section 1161 of the Code of Civil Procedure.

(D)  Committing waste as described in paragraph (4) of Section 1161 of the Code of Civil Procedure.

(E)  The tenant had a written lease that terminated on or after January 1, 2020, or January 1, 2022, if the lease is for a tenancy in a mobilehome, and after a written request or demand from the owner, the tenant has refused to execute a written extension or renewal of the lease for an additional term of similar duration with similar provisions, provided that those terms do not violate this section or any other provision of law.

(F)  Criminal activity by the tenant on the residential real property, including any common areas, or any criminal activity or criminal threat, as defined in subdivision (a) of Section 422 of the Penal Code, on or off the residential real property, that is directed at any owner or agent of the owner of the residential real property.

(G)  Assigning or subletting the premises in violation of the tenant's lease, as described in paragraph (4) of Section 1161 of the Code of Civil Procedure.

(H)  The tenant's refusal to allow the owner to enter the residential real property as authorized by Sections 1101.5 and 1954 of this code, and Sections 13113.7 and 17926.1 of the Health and Safety Code.

(I)  Using the premises for an unlawful purpose as described in paragraph (4) of Section 1161 of the Code of Civil Procedure.

(J)  The employee, agent, or licensee's failure to vacate after their termination as an employee, agent, or a licensee as described in paragraph (1) of Section 1161 of the Code of Civil Procedure.

(K)  When the tenant fails to deliver possession of the residential real property after providing the owner written notice as provided in Section 1946 of the tenant's intention to terminate the hiring of the real property, or makes a written offer to surrender that is accepted in writing by the landlord, but fails to deliver possession at the time specified in that written notice as described in paragraph (5) of Section 1161 of the Code of Civil Procedure.

(2)  No-fault just cause, which includes any of the following:

(A)  (i)  Intent to occupy the residential real property by the owner or their spouse, domestic partner, children, grandchildren, parents, or grandparents.

(ii)  For leases entered into on or after July 1, 2020, or July 1, 2022, if the lease is for a tenancy in a mobilehome, clause (i) shall apply only if the tenant agrees, in writing, to the termination, or if a provision of the lease allows the owner to terminate the lease if the owner, or their spouse, domestic partner, children, grandchildren, parents, or grandparents, unilaterally decides to occupy the residential real property. Addition of a provision allowing the owner to terminate the lease as described in this clause to a new or renewed rental agreement or fixed-term lease constitutes a similar provision for the purposes of subparagraph (E) of paragraph (1).

(B)  Withdrawal of the residential real property from the rental market.

(C)  (i)  The owner complying with any of the following:

(I)  An order issued by a government agency or court relating to habitability that necessitates vacating the residential real property.

(II)  An order issued by a government agency or court to vacate the residential real property.

(III)  A local ordinance that necessitates vacating the residential real property.

(ii)  If it is determined by any government agency or court that the tenant is at fault for the condition or conditions triggering the order or need to vacate under clause (i), the tenant shall not be entitled to relocation assistance as outlined in paragraph (3) of subdivision (d).

(D)  (i)  Intent to demolish or to substantially remodel the residential real property.

(ii)  For purposes of this subparagraph, "substantially remodel" means the replacement or substantial modification of any structural, electrical, plumbing, or mechanical system that requires a permit from a governmental agency, or the abatement of hazardous materials, including lead-based paint, mold, or asbestos, in accordance with applicable federal, state, and local laws, that cannot be reasonably accomplished in a safe manner with the tenant in place and that requires the tenant to vacate the residential real property for at least 30 days. Cosmetic improvements alone, including painting, decorating, and minor repairs, or other work that can be performed safely without having the residential real property vacated, do not qualify as substantial rehabilitation.

(c)  Before an owner of residential real property issues a notice to terminate a tenancy for just cause that is a curable lease violation, the owner shall first give notice of the violation to the tenant with an opportunity to cure the violation pursuant to paragraph (3) of Section 1161 of the Code of Civil Procedure. If the violation is not cured within the time period set forth in the notice, a three-day notice to quit without an opportunity to cure may thereafter be served to terminate the tenancy.

(d)  (1)  For a tenancy for which just cause is required to terminate the tenancy under subdivision (a), if an owner of residential real property issues a termination notice based on a no-fault just cause described in paragraph (2) of subdivision (b), the owner shall, regardless of the tenant's income, at the owner's option, do one of the following:

(A)  Assist the tenant to relocate by providing a direct payment to the tenant as described in paragraph (3).

(B)  Waive in writing the payment of rent for the final month of the tenancy, prior to the rent becoming due.

(2)  If an owner issues a notice to terminate a tenancy for no-fault just cause, the owner shall notify the tenant of the tenant's right to relocation assistance or rent waiver pursuant to this section. If the owner elects to waive the rent for the final month of the tenancy as provided in subparagraph (B) of paragraph (1), the notice shall state the amount of rent waived and that no rent is due for the final month of the tenancy.

(3)  (A)  The amount of relocation assistance or rent waiver shall be equal to one month of the tenant's rent that was in effect when the owner issued the notice to terminate the tenancy. Any relocation assistance shall be provided within 15 calendar days of service of the notice.

(B)  If a tenant fails to vacate after the expiration of the notice to terminate the tenancy, the actual amount of any relocation assistance or rent waiver provided pursuant to this subdivision shall be recoverable as damages in an action to recover possession.

(C)  The relocation assistance or rent waiver required by this subdivision shall be credited against any other relocation assistance required by any other law.

(4)  An owner's failure to strictly comply with this subdivision shall render the notice of termination void.

(e)  This section shall not apply to the following types of residential real properties or residential circumstances:

(1)  Transient and tourist hotel occupancy as defined in subdivision (b) of Section 1940.

(2)  Housing accommodations in a nonprofit hospital, religious facility, extended care facility, licensed residential care facility for the elderly, as defined in Section 1569.2 of the Health and Safety Code, or an adult residential facility, as defined in Chapter 6 of Division 6 of Title 22 of the Manual of Policies and Procedures published by the State Department of Social Services.

(3)  Dormitories owned and operated by an institution of higher education or a kindergarten and grades 1 to 12, inclusive, school.

(4)  Housing accommodations in which the tenant shares bathroom or kitchen facilities with the owner who maintains their principal residence at the residential real property.

(5)  Single-family owner-occupied residences, including both of the following:

(A)  A residence in which the owner-occupant rents or leases no more than two units or bedrooms, including, but not limited to, an accessory dwelling unit or a junior accessory dwelling unit.

(B)  A mobilehome.

(6)  A property containing two separate dwelling units within a single structure in which the owner occupied one of the units as the owner's principal place of residence at the beginning of the tenancy, so long as the owner continues in occupancy, and neither unit is an accessory dwelling unit or a junior accessory dwelling unit.

(7)  Housing that has been issued a certificate of occupancy within the previous 15 years, unless the housing is a mobilehome.

(8)  Residential real property, including a mobilehome, that is alienable separate from the title to any other dwelling unit, provided that both of the following apply:

(A)  The owner is not any of the following:

(i)  A real estate investment trust, as defined in Section 856 of the Internal Revenue Code.

(ii)  A corporation.

(iii)  A limited liability company in which at least one member is a corporation.

(iv)  Management of a mobilehome park, as defined in Section 798.2.

(B)  (i)  The tenants have been provided written notice that the residential property is exempt from this section using the following statement:

"This property is not subject to the rent limits imposed by Section 1947.12 of the Civil Code and is not subject to the just cause requirements of Section 1946.2 of the Civil Code. This property meets the requirements of Sections 1947.12 (d)(5) and 1946.2 (e)(8) of the Civil Code and the owner is not any of the following: (1) a real estate investment trust, as defined by Section 856 of the Internal Revenue Code; (2) a corporation; or (3) a limited liability company in which at least one member is a corporation."

(ii)  (I)  Except as provided in subclause (II), for a tenancy existing before July 1, 2020, the notice required under clause (i) may, but is not required to, be provided in the rental agreement.

(II)  For a tenancy in a mobilehome existing before July 1, 2022, the notice required under clause (i) may, but is not required to, be provided in the rental agreement.

(iii)  (I)  Except as provided in subclause (II), for any tenancy commenced or renewed on or after July 1, 2020, the notice required under clause (i) must be provided in the rental agreement.

(II)  For any tenancy in a mobilehome commenced or renewed on or after July 1, 2022, the notice required under clause (i) shall be provided in the rental agreement.

(iv)  Addition of a provision containing the notice required under clause (i) to any new or renewed rental agreement or fixed-term lease constitutes a similar provision for the purposes of subparagraph (E) of paragraph (1) of subdivision (b).

(9)  Housing restricted by deed, regulatory restriction contained in an agreement with a government agency, or other recorded document as affordable housing for persons and families of very low, low, or moderate income, as defined in Section 50093 of the Health and Safety Code, or subject to an agreement that provides housing subsidies for affordable housing for persons and families of very low, low, or moderate income, as defined in Section 50093 of the Health and Safety Code or comparable federal statutes.

(f)  An owner of residential real property subject to this section shall provide notice to the tenant as follows:

(1)  (A)  Except as provided in subparagraph (B), for any tenancy commenced or renewed on or after July 1, 2020, as an addendum to the lease or rental agreement, or as a written notice signed by the tenant, with a copy provided to the tenant.

(B)  For a tenancy in a mobilehome commenced or renewed on or after July 1, 2022, as an addendum to the lease or rental agreement, or as a written notice signed by the tenant, with a copy provided to the tenant.

(2)  (A)  Except as provided in subparagraph (B), for a tenancy existing prior to July 1, 2020, by written notice to the tenant no later than August 1, 2020, or as an addendum to the lease or rental agreement.

(B)  For a tenancy in a mobilehome existing prior to July 1, 2022, by written notice to the tenant no later than August 1, 2022, or as an addendum to the lease or rental agreement.

(3)  The notification or lease provision shall be in no less than 12-point type, and shall include the following:

"California law limits the amount your rent can be increased. See Section 1947.12 of the Civil Code for more information. California law also provides that after all of the tenants have continuously and lawfully occupied the property for 12 months or more or at least one of the tenants has continuously and lawfully occupied the property for 24 months or more, a landlord must provide a statement of cause in any notice to terminate a tenancy. See Section 1946.2 of the Civil Code for more information."

The provision of the notice shall be subject to Section 1632.

(g)  (1)  This section does not apply to the following residential real property:

(A)  Residential real property subject to a local ordinance requiring just cause for termination of a residential tenancy adopted on or before September 1, 2019, in which case the local ordinance shall apply.

(B)  Residential real property subject to a local ordinance requiring just cause for termination of a residential tenancy adopted or amended after September 1, 2019, that is more protective than this section, in which case the local ordinance shall apply. For purposes of this subparagraph, an ordinance is "more protective" if it meets all of the following criteria:

(i)  The just cause for termination of a residential tenancy under the local ordinance is consistent with this section.

(ii)  The ordinance further limits the reasons for termination of a residential tenancy, provides for higher relocation assistance amounts, or provides additional tenant protections that are not prohibited by any other provision of law.

(iii)  The local government has made a binding finding within their local ordinance that the ordinance is more protective than the provisions of this section.

(2)  A residential real property shall not be subject to both a local ordinance requiring just cause for termination of a residential tenancy and this section.

(3)  A local ordinance adopted after September 1, 2019, that is less protective than this section shall not be enforced unless this section is repealed.

93

— 12 —

(h)  Any waiver of the rights under this section shall be void as contrary to public policy.

(i)  For the purposes of this section, the following definitions shall apply:

(1)  "Owner" includes any person, acting as principal or through an agent, having the right to offer residential real property for rent, and includes a predecessor in interest to the owner.

(2)  "Residential real property" means any dwelling or unit that is intended for human habitation, including any dwelling or unit in a mobilehome park.

(3)  "Tenancy" means the lawful occupation of residential real property and includes a lease or sublease.

(j)  This section shall not apply to a homeowner of a mobilehome, as defined in Section 798.9.

(k)  This section shall remain in effect only until January 1, 2030, and as of that date is repealed.

SEC. 4.  Section 1947.12 of the Civil Code is amended to read:

1947.12.  (a)  (1)  Subject to subdivision (b), an owner of residential real property shall not, over the course of any 12-month period, increase the gross rental rate for a dwelling or a unit more than 5 percent plus the percentage change in the cost of living, or 10 percent, whichever is lower, of the lowest gross rental rate charged for that dwelling or unit at any time during the 12 months prior to the effective date of the increase. In determining the lowest gross rental amount pursuant to this section, any rent discounts, incentives, concessions, or credits offered by the owner of such unit of residential real property and accepted by the tenant shall be excluded. The gross per-month rental rate and any owner-offered discounts, incentives, concessions, or credits shall be separately listed and identified in the lease or rental agreement or any amendments to an existing lease or rental agreement.

(2)  If the same tenant remains in occupancy of a unit of residential real property over any 12-month period, the gross rental rate for the unit of residential real property shall not be increased in more than two increments over that 12-month period, subject to the other restrictions of this subdivision governing gross rental rate increase.

(b)  For a new tenancy in which no tenant from the prior tenancy remains in lawful possession of the residential real property, the owner may establish the initial rental rate not subject to subdivision (a). Subdivision (a) is only applicable to subsequent increases after that initial rental rate has been established.

(c)  A tenant of residential real property subject to this section shall not enter into a sublease that results in a total rent for the premises that exceeds the allowable rental rate authorized by subdivision (a). Nothing in this subdivision authorizes a tenant to sublet or assign the tenant's interest where otherwise prohibited.

(d)  This section shall not apply to the following residential real properties:

(1)  Housing restricted by deed, regulatory restriction contained in an agreement with a government agency, or other recorded document as affordable housing for persons and families of very low, low, or moderate

income, as defined in Section 50093 of the Health and Safety Code, or subject to an agreement that provides housing subsidies for affordable housing for persons and families of very low, low, or moderate income, as defined in Section 50093 of the Health and Safety Code or comparable federal statutes.

(2)  Dormitories owned and operated by an institution of higher education or a kindergarten and grades 1 to 12, inclusive, school.

(3)  Housing subject to rent or price control through a public entity's valid exercise of its police power consistent with Chapter 2.7 (commencing with Section 1954.50) that restricts annual increases in the rental rate to an amount less than that provided in subdivision (a).

(4)  Housing that has been issued a certificate of occupancy within the previous 15 years, unless the housing is a mobilehome.

(5)  Residential real property that is alienable separate from the title to any other dwelling unit, including a mobilehome, provided that both of the following apply:

(A)  The owner is not any of the following:

(i)  A real estate investment trust, as defined in Section 856 of the Internal Revenue Code.

(ii)  A corporation.

(iii)  A limited liability company in which at least one member is a corporation.

(iv)  Management of a mobilehome park, as defined in Section 798.2.

(B)  (i)  The tenants have been provided written notice that the residential real property is exempt from this section using the following statement:

"This property is not subject to the rent limits imposed by Section 1947.12 of the Civil Code and is not subject to the just cause requirements of Section 1946.2 of the Civil Code. This property meets the requirements of Sections 1947.12 (d)(5) and 1946.2 (e)(8) of the Civil Code and the owner is not any of the following: (1) a real estate investment trust, as defined by Section 856 of the Internal Revenue Code; (2) a corporation; or (3) a limited liability company in which at least one member is a corporation."

(ii)  For a tenancy existing before July 1, 2020, or July 1, 2022, if the lease is for a tenancy in a mobilehome, the notice required under clause (i) may, but is not required to, be provided in the rental agreement.

(iii)  For a tenancy commenced or renewed on or after July 1, 2020, or July 1, 2022, if the lease is for a tenancy in a mobilehome, the notice required under clause (i) must be provided in the rental agreement.

(iv)  Addition of a provision containing the notice required under clause (i) to any new or renewed rental agreement or fixed-term lease constitutes a similar provision for the purposes of subparagraph (E) of paragraph (1) of subdivision (b) of Section 1946.2.

(6)  A property containing two separate dwelling units within a single structure in which the owner occupied one of the units as the owner's principal place of residence at the beginning of the tenancy, so long as the

owner continues in occupancy, and neither unit is an accessory dwelling unit or a junior accessory dwelling unit.

(e)  An owner shall provide notice of any increase in the rental rate, pursuant to subdivision (a), to each tenant in accordance with Section 827.

(f)  (1)  On or before January 1, 2030, the Legislative Analyst's Office shall report to the Legislature regarding the effectiveness of this section and Section 1947.13. The report shall include, but not be limited to, the impact of the rental rate cap pursuant to subdivision (a) on the housing market within the state.

(2)  The report required by paragraph (1) shall be submitted in compliance with Section 9795 of the Government Code.

(g)  For the purposes of this section, the following definitions shall apply:

(1)  "Consumer Price Index for All Urban Consumers for All Items" means the following:

(A)  The Consumer Price Index for All Urban Consumers for All Items (CPI-U) for the metropolitan area in which the property is located, as published by the United States Bureau of Labor Statistics, which are as follows:

(i)  The CPI-U for the Los Angeles-Long Beach-Anaheim metropolitan area covering the Counties of Los Angeles and Orange.

(ii)  The CPI-U for the Riverside-San Bernardo-Ontario metropolitan area covering the Counties of Riverside and San Bernardino.

(iii)  The CPI-U for the San Diego-Carlsbad metropolitan area covering the County of San Diego.

(iv)  The CPI-U for the San Francisco-Oakland-Hayward metropolitan area covering the Counties of Alameda, Contra Costa, Marin, San Francisco, and San Mateo.

(v)  Any successor metropolitan area index to any of the indexes listed in clauses (i) to (iv), inclusive.

(B)  If the United States Bureau of Labor Statistics does not publish a CPI-U for the metropolitan area in which the property is located, the California Consumer Price Index for All Urban Consumers for All Items as published by the Department of Industrial Relations.

(C)  On or after January 1, 2021, if the United States Bureau of Labor Statistics publishes a CPI-U index for one or more metropolitan areas not listed in subparagraph (A), that CPI-U index shall apply in those areas with respect to rent increases that take effect on or after August 1 of the calendar year in which the 12-month change in that CPI-U, as described in subparagraph (B) of paragraph (3), is first published.

(2)  "Owner" includes any person, acting as principal or through an agent, having the right to offer residential real property for rent, and includes a predecessor in interest to the owner.

(3)  (A)  "Percentage change in the cost of living" means the percentage change, computed pursuant to subparagraph (B), in the applicable, as determined pursuant to paragraph (1), Consumer Price Index for All Urban Consumers for All Items.

(B) (i)  For rent increases that take effect before August 1 of any calendar year, the following shall apply:

(I)  The percentage change shall be the percentage change in the amount published for April of the immediately preceding calendar year and April of the year before that.

(II)  If there is not an amount published in April for the applicable geographic area, the percentage change shall be the percentage change in the amount published for March of the immediately preceding calendar year and March of the year before that.

(ii)  For rent increases that take effect on or after August 1 of any calendar year, the following shall apply:

(I)  The percentage change shall be the percentage change in the amount published for April of that calendar year and April of the immediately preceding calendar year.

(II)  If there is not an amount published in April for the applicable geographic area, the percentage change shall be the percentage change in the amount published for March of that calendar year and March of the immediately preceding calendar year.

(iii)  The percentage change shall be rounded to the nearest one-tenth of 1 percent.

(4)  "Residential real property" means any dwelling or unit that is intended for human habitation, including any dwelling or unit in a mobilehome park.

(5)  "Tenancy" means the lawful occupation of residential real property and includes a lease or sublease.

(h) (1)  This section shall apply to all rent increases subject to subdivision (a) occurring on or after March 15, 2019, except as provided in subdivision (i).

(2)  In the event that an owner has increased the rent by more than the amount permissible under subdivision (a) between March 15, 2019, and January 1, 2020, both of the following shall apply:

(A)  The applicable rent on January 1, 2020, shall be the rent as of March 15, 2019, plus the maximum permissible increase under subdivision (a).

(B)  An owner shall not be liable to the tenant for any corresponding rent overpayment.

(3)  An owner of residential real property subject to subdivision (a) who increased the rental rate on that residential real property on or after March 15, 2019, but prior to January 1, 2020, by an amount less than the rental rate increase permitted by subdivision (a) shall be allowed to increase the rental rate twice, as provided in paragraph (2) of subdivision (a), within 12 months of March 15, 2019, but in no event shall that rental rate increase exceed the maximum rental rate increase permitted by subdivision (a).

(i) (1)  Notwithstanding subdivision (h), this section shall apply only to rent increases for a tenancy in a mobilehome subject to subdivision (a) occurring on or after February 18, 2021.

(2)  In the event that an owner has increased the rent for a tenancy in a mobilehome by more than the amount permissible under subdivision (a)

between February 18, 2021, and January 1, 2022, both of the following shall apply:

(A)  The applicable rent on January 1, 2022, shall be the rent as of February 18, 2021, plus the maximum permissible increase under subdivision (a).

(B)  An owner shall not be liable to the tenant for any corresponding rent overpayment.

(3)  An owner of residential real property subject to subdivision (a) who increased the rental rate on that residential real property on or after February 18, 2021, but prior to January 1, 2022, by an amount less than the rental rate increase permitted by subdivision (a) shall be allowed to increase the rental rate twice, as provided in paragraph (2) of subdivision (a), within 12 months of February 18, 2021, but in no event shall that rental rate increase exceed the maximum rental rate increase permitted by subdivision (a).

(j)  This section shall not apply to a homeowner of a mobilehome, as defined in Section 798.9.

(k)  Any waiver of the rights under this section shall be void as contrary to public policy.

(*l*)  This section shall remain in effect until January 1, 2030, and as of that date is repealed.

(m)  (1)  The Legislature finds and declares that the unique circumstances of the current housing crisis require a statewide response to address rent gouging by establishing statewide limitations on gross rental rate increases.

(2)  It is the intent of the Legislature that this section should apply only for the limited time needed to address the current statewide housing crisis, as described in paragraph (1). This section is not intended to expand or limit the authority of local governments to establish local policies regulating rents consistent with Chapter 2.7 (commencing with Section 1954.50), nor is it a statement regarding the appropriate, allowable rental rate increase when a local government adopts a policy regulating rent that is otherwise consistent with Chapter 2.7 (commencing with Section 1954.50).

(3)  Nothing in this section authorizes a local government to establish limitations on any rental rate increases not otherwise permissible under Chapter 2.7 (commencing with Section 1954.50), or affects the existing authority of a local government to adopt or maintain rent controls or price controls consistent with that chapter.

O